UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
:
SABOOR H. ABDULJAAMI, :
:
                Plaintiff, :
: 05 Civ. 9464 (GEL)
    -against- :
: **OPINION AND ORDER**
:
LEGALMATCH.COM INC., BRAD STARK, :
RANDY WELLS, and LAURIE ZIFFRIN, :
:
                Defendants. :
:
------------------------------------------------------------x

Saboor H. AbdulJaami, AbdulJaami, PLLC,
New York, New York, for Plaintiff.

Edward Weissman, Esq., Law Offices of
Edward Weissman, New York, New York,
for Defendants.

GERARD E. LYNCH, District Judge:

      Plaintiff pro se Saboor AbdulJaami brings this action against defendant corporation LegalMatch.com, Inc. ("LegalMatch") and individual defendants Brad Stark, Randy Wells, and Laurie Ziffrin. Plaintiff's initial complaint was filed on November 8, 2005. On December 2, 2005, defendants moved to stay or dismiss the action in favor of arbitration pursuant to the terms of a prior agreement between the parties. On December 27, 2005, plaintiff filed his response to defendants' motion and an amended complaint.[1] Defendants did not oppose the filing of the

---

[1] Plaintiff's response and amended complaint were "filed" on December 27, 2005, because that is when they were received by the Court. For purposes of determining timeliness, however, AbdulJaami's response and amended complaint are considered served when he mailed them, on December 22, 2005. Fed. R. Civ. P. 5(b)(2)(B).

amended complaint,[2] but requested that their motion to dismiss be applied to the amended complaint. (Letter from Edward Wiessman, Dec. 27, 2005; Letter from Edward Wiessman, Mar. 16, 2006.) Plaintiff did not oppose this request. Then, on March 15, 2006, plaintiff moved to amend his complaint a second time. Defendants did not submit separate opposition to plaintiff's motion to amend, but they again requested that their motion to dismiss be applied to plaintiff's motion to amend. For the reasons given below, plaintiff's motion to amend will be denied, defendants' motion to stay or dismiss will be granted, and the action will be dismissed.

**BACKGROUND**

The following facts are taken from the amended complaint,[3] and are assumed to be true for purposes of this motion to dismiss. LegalMatch is a company that matches attorneys with clients and assists attorneys in marketing their services. On April 20, 2005, AbdulJaami, a practicing attorney, was contacted by Stark, an employee of LegalMatch, who told AbdulJaami about various benefits of LegalMatch's services, such as the limit on the number of attorneys who are granted access to LegalMatch's client database. Over the next several days, AbdulJaami and Stark discussed the possibility of the parties entering into a business relationship, but on April 25 AbdulJaami emailed Stark and informed him that he did not wish to purchase LegalMatch's services.

---

[2] Plaintiff claims that this amendment was an amendment as of right. Because defendants did not oppose the filing of the amended complaint, this Court need not decide whether it is correctly so characterized.

[3] As plaintiff's motion to amend the amended complaint is still sub judice, the amended complaint is the currently operative complaint in this matter. In any event, the three complaints are virtually identical with respect to their factual allegations.

Ten days later, on May 5, Stark called AbdulJaami and left a message informing him that "an allocation ha[d] opened up . . . in NYC" and that LegalMatch was "seeking one additional attorney to bring on board." (Am. Compl. ¶ 22.) Stark encouraged AbdulJaami to "call quick" and "as soon as you can." (Id.) Stark and AbdulJaami spoke on the phone the following day. Stark told AbdulJaami that LegalMatch was receiving 20 to 30 new business transactional clients per month in early 2005, an increase over previous months, and that if this trend continued they expected 30 to 40 new clients per month by June 2005. Stark said that based on this increase in client activity, LegalMatch was looking to add an attorney in the business transactional area – AbdulJaami's area of service. AbdulJaami responded by expressing his concern that LegalMatch's clients, even clients categorized as seeking business transactional services, might not be interested in the specific corporate and commercial transactional services that AbdulJaami provided. Stark sought to assuage AbdulJaami's concerns by telling him that, while he could not let AbdulJaami view client files, he could tell AbdulJaami that he was looking at the list of files and that at least four clients were currently available who seemed to match AbdulJaami's requirements.

The discussion then turned to cost. Stark informed AbdulJaami that if he were interested in procuring LegalMatch's services he would have to pay a $500 refundable application fee. Once he was accepted he would then have to pay an $18,750 membership fee – $1,875 payable at the time AbdulJaami signed his contract, and the remainder payable in eleven consecutive monthly payments of $1,611.86. Alternatively, AbdulJaami could elect to pay the entire amount in full upon signing the contract, in which case the fee would be discounted to $15,397.50.

AbdulJaami began the application process on May 6, 2005, by paying the $500 application fee. Three days later he received a package of information from LegalMatch including a document titled "LegalMatch Attorney Membership Agreement" (the "Agreement"). AbdulJaami was unsure whether or how LegalMatch had reviewed his application, but he assumed that the provision of the Agreement indicated that his application had been accepted. On May 16, 2005, AbdulJaami signed the Agreement, returned it to LegalMatch, and paid the discounted $15,397.50 membership fee by credit card.

The next day AbdulJaami logged on to the LegalMatch website to view and bid for potential clients. Upon logging in, he saw that there were only 34 available cases, many of which had been open for months and some of which had been open since 2004 or 2003. Based on Stark's representation that LegalMatch was receiving 20-30 new cases each month, AbdulJaami had expected to see more new cases. Additionally, AbdulJaami observed that many of the cases were litigation or administrative matters, both of which fall outside of his area of service, and that some potential clients were seeking only pro bono legal services.

Despite this initial disappointment, over the next few days AbdulJaami sent proposals to six potential clients on the LegalMatch system. He received no responses. On May 25, AbdulJaami received an email from LegalMatch informing him that a new case request had been posted in his practice area. Once again, AbdulJaami contacted the client, and once again he received no response.

At this point, beginning to fear that he had been duped into spending over $15,000 on a service that was of no value to him, AbdulJaami conducted some cursory research on the internet in an attempt to learn more about LegalMatch. AbdulJaami learned that LegalMatch's founder,

Dmitri Shubov, had a history of legal troubles stemming from his actions as the CEO and President of LegalMatch, and that various former employees of LegalMatch had complained of the company's "strong-arm tactics," "bullying," and "high pressure sales tactics." (Am. Compl. ¶ 44.) AbdulJaami claims that Shubov continues to control the company through his control of his successor CEOs, defendants Wells and Ziffrin.

After two weeks of disappointing results, and in light of his internet research, on May 30, 2005, AbdulJaami wrote to LegalMatch requesting a full refund of his membership fee. On June 1 he was contacted by Michael Pasco, a LegalMatch employee. Pasco was "hostile" toward AbdulJaami and said that unless AbdulJaami told him the "real reason" for his desire to leave LegalMatch he would not receive a refund. (Am. Compl. ¶ 48.) The next day AbdulJaami received a telephone call from defendant Wells, who was then the CEO of LegalMatch. Wells reiterated Pasco's message that unless AbdulJaami divulged the real reason for his dissatisfaction he would not receive a refund. After AbdulJaami told Wells that everything was explained in his May 30 letter, Wells became "infuriated," began shouting, "forcefully demanded" that AbdulJaami have another conversation with him in the future, and, after AbdulJaami expressed his opinion that a future conversation would not be useful, became "extremely irate and domineering." (Am. Compl. ¶ 49.)

Following some further emailing between Wells and AbdulJaami, Wells sent AbdulJaami a message on June 3, 2005, indicating that he would authorize the refund of AbdulJaami's membership fee by the end of the month. However, by early July AbdulJaami had not received his refund or any explanation for the delay from LegalMatch. On July 7 he emailed Wells inquiring about the status of his refund, but immediately received a response notification stating

that delivery of his message had failed. AbdulJaami subsequently learned that Wells had left LegalMatch sometime in June, and that defendant Ziffrin was the new CEO of the company.

With Wells gone, AbdulJaami attempted to contact other LegalMatch employees about his promised refund. Wells's June 3 email to AbdulJaami regarding the refund had been carbon-copied to three other individuals; AbdulJaami emailed each of those individuals about the promised refund, and also sent a message to a general email address included in the press release announcing Ziffrin's appointment as CEO.

In response to these emails, AbdulJaami received a phone call from LegalMatch's in-house counsel Ken LaMance. LaMance told AbdulJaami that Wells had not promised AbdulJaami a refund, that LegalMatch did not give refunds, and that even if Wells had promised a refund there was no way for LegalMatch to verify the amount. LaMance then offered AbdulJaami $8,000, and told him that if AbdulJaami persisted in his attempts to get a full refund, LegalMatch "would be happy to settle the matter in court." (Am. Compl. ¶ 59.)

AbdulJaami attempted to resolve the dispute by contacting Ziffrin directly, filing a complaint with the Better Business Bureau, disputing LegalMatch's charge on his credit card, and petitioning the New York State Bar Association. None of these efforts was successful. This suit followed on November 8, 2005, with AbdulJaami asserting claims under civil RICO and common law fraud, fraud in the inducement, negligent misrepresentation, and negligence.

## DISCUSSION

Defendants move to stay or dismiss this action pursuant to the arbitration provision of the Agreement and the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"). Both parties agree that AbdulJaami and LegalMatch are parties to the Agreement, and that clause 10 of the

Agreement reads: "Any controversy or claim arising out of or relating to this Agreement or the breach thereof, or to the Program, shall be settled by arbitration . . . ." The Agreement defines "the Program" as LegalMatch's "Internet-based forum that facilitates communications."

That is where the common ground ends. AbdulJaami argues that the arbitration clause is unenforceable, that this action is outside the scope of the arbitration clause, and that defendants fraudulently induced him to enter the Agreement. AbdulJaami's arguments are without merit.

I. AbdulJaami's Claims Are Subject to the Arbitration Provision

AbdulJaami's claims fall within the scope of the Agreement's arbitration clause. The clause states that *any* claim merely *relating to* either the Agreement or to LegalMatch's Program is to be settled by arbitration. This is a broad arbitration provision. See Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 35-36 (2d Cir. 2002) (stating that "all disputes" language creates a "broad" arbitration provision). A broad arbitration provision creates a presumption of arbitrability, and arbitration is favored "unless it can be said 'with positive assurance' that an arbitration clause is not susceptible to an interpretation that covers the asserted dispute." Id. at 35, quoting Thomas James Assocs., Inc. v. Jameson, 102 F.3d 60, 65 (2d Cir. 1996).

AbdulJaami's claims relate directly to the Agreement and the Program. As outlined above, AbdulJaami claims that defendants represented to him that the Program would provide certain benefits involving access to new potential clients. Based on these representations, AbdulJaami entered into the Agreement, which defines the services he was to be provided under the Program (clause 1 of the Agreement), sets out the membership fees he was to pay in return for those services (clause 2), and describes the procedures for termination of his membership (clause 8). The instant dispute arises from AbdulJaami's dissatisfaction with the services

provided by Program (relating to clause 1) and his attempts to terminate the Agreement and obtain a refund of his membership fee (relating to clauses 2 and 8). All of these claims relate to the Agreement or the Program, and are therefore within the scope of the Agreement's arbitration provision.

AbdulJaami's argument that his claims are not subject to the arbitration provision because they are based on RICO and various common law causes of action is merritless. When determining whether a claim is subject to arbitration, courts must look to the factual allegations in the complaint, not the causes of action asserted by the plaintiff. JLM Indus., Inc. v. Stolt-Nielson SA, 387 F.3d 163, 173 (2d Cir. 2004). The factual allegations in AbdulJaami's complaint are related to the Program and the Agreement, and therefore they are covered by the arbitration provision.

II. Enforceability of the Arbitration Provision

In addition to arguing that his claims fall outside the scope of the arbitration provision, AbdulJaami argues that the provision itself is unenforceable both as a contract of adhesion and as the result of defendants' fraudulent inducement. These objections to the enforceability of the Agreement and the arbitration provision are questions for the arbitrator, and in any event they are without merit.

The Supreme Court has recently explained that "[c]hallenges to the validity of arbitration agreements . . . can be divided into two types. One type challenges specifically the validity of the agreement to arbitrate. The other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid."

8

Buckeye Check Cashing, Inc. v. Cardegna, 126 S. Ct. 1204, 1208 (2006). Under section 4 of the FAA, a federal court may adjudicate a dispute specifically regarding the validity of an arbitration provision, but claims regarding the validity of the contract as a whole must be heard by the arbitrator. Id., quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04 (1967). AbdulJaami's claims are of the latter variety.

AbdulJaami attempts to frame his objections as objections to the arbitration provision. However, his allegations that the contract was a contract of adhesion and that he was fraudulently induced into entering it relate to the Agreement as a whole. Claims of adhesion are generally considered objections to a contract and not to an arbitration provision. See Wright v. SFX Entm't Inc., 00 Civ. 5354, 2001 WL 103433, at *3 (S.D.N.Y. Feb. 7, 2001). The factual allegations in plaintiff's complaint describe various instances of forcefulness and misrepresentation on the part of LegalMatch employees in attempting to convince AbdulJaami to agree to purchase LegalMatch's services, but nowhere in the complaint does AbdulJaami allege that these supposedly high-pressure or deceptive tactics were employed specifically with respect to the arbitration provision. In response to defendants' motion, AbdulJaami provides copies of email communications between himself and LegalMatch representatives. The arbitration provision is not discussed anywhere in these communications.

That AbdulJaami's amended complaint includes a cause of action for fraud in the inducement that specifically mentions the arbitration provision (Am. Compl. ¶¶ 96-106) does not alter the fact that the *factual allegations* in the complaint relate to the Agreement as a whole. If merely amending the complaint to add a cause of action alleging that "misrepresentations of LegalMatch . . . were critical to plaintiff's decision to enter into an arbitration agreement with

9

LegalMatch" (Am. Compl. ¶ 99) were sufficient to defeat defendants' motion, then the Supreme Court's division between specific and general challenges to arbitration agreements would become a distinction without a difference. When a contract contains an arbitration provision, any challenge to the contract as a whole will necessarily implicate the arbitration provision, because the provision is contained within the contract. For the Supreme Court's distinction to have any force, therefore, a plaintiff seeking specifically to challenge an arbitration provision must do more than simply assert that he never would have agreed to the arbitration provision if not for a defendant's malfeasance. It is not enough for a plaintiff to nominally challenge the arbitration provision; rather, a plaintiff must allege "at least some defects pertaining specifically to the arbitration clause itself." Wright, 2001 WL 103433, at *4, quoting 2 Federal Arbitration Law § 15.3.4; see also Fed. R. Civ. P. 9(b) ("In all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity."). If a mere nominal challenge were sufficient, then a plaintiff could successfully defeat a motion for arbitration simply by *asserting* that he is specifically challenging the arbitration provision, or by adding a cause of action unsupported by factual allegations. That is not the law.

In any event, to the extent that AbdulJaami attempts specifically to challenge the arbitration clause as an unenforceable contract of adhesion or as induced by defendants' alleged fraud, his arguments are without merit.

In support of his claim of adhesion, AbdulJaami relies on Aviall, Inc. v. Ryder System, Inc., 913 F. Supp. 826 (S.D.N.Y. 1996). However, Aviall states that "contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to *unrepresented, uneducated, and needy individuals* on a take-it-or-leave-it basis, with no opportunity to change

any of the contract's terms." Id. at 831 (emphasis added). AbdulJaami is an educated attorney, and the contract at issue here was not for food, water, or shelter, but for a marketing service that he was free to accept or reject. If defendants shouted and yelled on the phone, AbdulJaami was free to hang up and go on about his business.

AbdulJaami claims that he was powerless to negotiate the arbitration provision of the Agreement, but he does not allege that he ever actually *attempted* to negotiate the arbitration provision. In fact, AbdulJaami states that the first copy of the Agreement he received contained a term that set the membership fee at $18,750, but that he returned that copy and received a revised Agreement that reflected the agreed-upon fee of $15,397.50. (Am. Comp. ¶ 32.) Thus, AbdulJaami *did* have an opportunity to review the terms of the contract and request changes to terms that did not meet with his approval. In any event, regardless of the procedures employed in negotiating the arbitration provision, "it would not be unenforceable because it is not unduly oppressive, unconscionable, contrary to public policy, or outside the realm of [AbdulJaami's] reasonable expectations." Aviall, 913 F. Supp. at 833. Rather, the provision is, as AbdulJaami admits, a standard form arbitration provision (AbdulJaami Aff. ¶ 10) and is a perfectly reasonable contract term. In light of the fact that a federal statute, the FAA, specifically approves of the enforcement of arbitration agreements, any argument that the Agreement's arbitration provision is oppressive, unconscionable, or contrary to public policy would be completely without merit.

AbdulJaami's claim of fraud in the inducement is similarly flawed with respect to the arbitration provision. AbdulJaami alleges no facts connecting any misrepresentation by the defendants to the arbitration provision. The factual allegations in the complaint and the evidence

provided by AbdulJaami in response to defendants' motion show that defendants repeatedly touted the value and effectiveness of the LegalMatch service, but AbdulJaami does not allege any misrepresentation by defendants that related to or fraudulently induced him to enter the *arbitration provision* as distinct from the Agreement as a whole.

AbdulJaami's objections to the Agreement are general objections to the contract, and therefore should be decided by an arbitrator pursuant to the Agreement's arbitration provision. To the extent that AbdulJaami raises specific objections to the arbitration provision, those objections are without merit. Accordingly, defendants' motion will be granted. The only remaining question is whether to stay or dismiss the action. Because it appears that all issues in this action are arbitrable, there is no purpose in retaining jurisdiction and the action will be dismissed. ITT Indus., Inc. v. Werner Pump Co., 01 Civ. 8552, 2001 WL 1658220, at *2 (S.D.N.Y. Dec. 27, 2001).

III. AbdulJaami's Motion to Amend the Complaint

AbdulJaami's motion to amend his complaint will be denied. As a general matter, leave to amend is "freely given when justice so requires." Fed. R. Civ. P. 15(a). However, if the amendment would be futile, leave will not be granted. United States ex rel. Mar. Admin. v. Cont'l Ill. Nat'l Bank & Trust Co., 889 F.2d 1248, 1254 (2d Cir. 1989). Here, the proposed second amended complaint removes defendant Wells as a defendant and incorporates an affidavit from Wells that supports some of AbdulJaami's general claims. However, nothing in the proposed second amended complaint bears on whether the matter should be dismissed pending arbitration. Therefore, the amendment would be futile and AbdulJaami's motion will be denied.

## CONCLUSION

Defendants' motion to dismiss (Doc. #5) is granted. Plaintiff's motion to amend the complaint (Doc. #14) is denied. The Clerk of the Court is respectfully directed to close the case.

SO ORDERED.

Dated: New York, New York
April 24, 2005

*[signature]*
GERARD E. LYNCH
United States District Judge